UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05-CV-331-H

MICHAEL MACKIN                                                                          PLAINTIFFS
and MARY MACKIN RITCHIE

v.

COSMOS BROADCASTING, INC.                                                       DEFENDANTS
and WAVE-3 LOUISVILLE

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Michael Mackin and Mary Mackin Ritchie have brought this action against Defendants Cosmos Broadcasting, Inc., and its subsidiary, television station WAVE-3 Louisville ("WAVE-3"). Plaintiffs' complaint alleges defamation and false light invasion of privacy claims based on three news reports broadcast by WAVE-3 pertaining to a real estate transaction in which Plaintiffs were involved. Defendants have moved for summary judgment on both claims primarily on the grounds that the subject of the reports was a matter of public concern. For the reasons that follow, the Court will not adopt Defendants' extraordinarily broad definition of a public concern in the First Amendment context and, therefore, will deny the motion.

I.

The allegations in this case arise from WAVE-3's broadcast of three "Troubleshooter" reports on May 12, 13, and 14, 2004. WAVE-3 characterizes the "Troubleshooter" segment of its newscast as an investigative report that throughout its existence has "fought consumer problems and stood up for its viewers." Defendants' Memorandum in Support of Motion for Summary Judgment at 1.

On the dates in question, the "Troubleshooter" segment focused on the 2002 purchase of a Louisville, Kentucky home. Lois June Jackson, a blind woman, was the purchaser. Mackin was the seller and his sister, Ritchie, though not a licensed real estate agent, was the primary liaison between Mackin and Jackson. Jackson's coworker, Lieutenant Lynn Hunt of the Louisville Metro Police Department, contacted WAVE-3 in February 2004 regarding the sale, alleging that Mackin and Ritchie had "taken advantage" of Jackson by selling her a home "in pretty bad shape." *Id.* at 2.

The details of the interaction between Ritchie, Mackin, and Jackson are disputed. Initially, WAVE-3 reporter Charla Young contacted and interviewed Jackson. She visited Jackson's home and began to research the issues surrounding her purchase of the home. Young attempted to interview Mackin but the meeting did not take place. Young's subsequent efforts to contact Mackin before May 12 were unsuccessful.

On May 12, WAVE-3 aired a "Troubleshooter" segment that it has characterized as alleging that "Mackin and Ritchie took advantage of [Jackson's] disability and sold her a home . . . that was in atrocious condition." *Id.* at 9. The segment also included Jackson's allegations that "Mackin and Ritchie handled Ms. Jackson's loan through a Southern Indiana friend without an appraisal or the benefit of an inspection," and that "Mackin and Ritchie [made] themselves unavailable to let her sighted brother look at the house before she bought it," and indicated that an appraiser contacted by WAVE-3 "appraised the house for a fraction of what Ms. Jackson paid." *Id.*

Mackin contacted Young on May 13 and disputed several of the assertions made in May 12 segment, but refused to go on-air, as did Ritchie. WAVE-3 reporter Eric Flack subsequently

2

attempted to interview Ritchie and Mackin, the latter at his home, but was unsuccessful. Nevertheless, Young revised the May 13 and 14 segments in order to omit some of the information Mackin had disputed. On May 27, 2004, an attorney representing Mackin sent WAVE-3 a letter demanding a retraction and correction of the May 12-14 broadcasts. To the Court's knowledge, no such retraction or correction was aired, and Mackin refused WAVE-3's offers to appear on camera.

On May 12, 2005, Plaintiffs filed their two-count complaint in Jefferson Circuit Court alleging defamation and false light invasion of privacy. Defendants, both South Carolina corporations, removed to federal court. Currently before the Court is Defendants' motion for summary judgment, which seeks dismissal of Plaintiffs' defamation claim on a variety of grounds ancillary to Defendants' characterization of the focus of the "Troubleshooter" segments as a matter of public concern, and which seeks dismissal of Plaintiffs' false light claim on the grounds that Plaintiffs allegedly have not proven actual malice. The Court has had the benefit of the parties' briefing and oral arguments on the issues, and will address each contention in turn.

II.

To make out a prima facie case of defamation under Kentucky law, a plaintiff must prove the existence of (1) defamatory language, (2) about the plaintiff, (3) which is published, and (4) which causes injury to reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004); *see also Trover v. Paxton Media Group*, 2007 WL 4302088, 36 Med. L. Rptr. 1241 (W.D. Ky. Dec. 5, 2007). On the other hand, the First Amendment protects "freedom of expression upon public questions." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). Thus, state defamation laws such as Kentucky's inevitably conflict with the First Amendment where

plaintiffs invoke them against statements on matters of public concern. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) ("Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury"); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967) (acknowledging "the antithesis between civil libel actions and the freedom of speech and press").

The United States Supreme Court has resolved this tension by holding that a plaintiff may not recover on a defamation claim regarding statements on matters of public concern "unless he proves that the statement was made with 'actual malice'-that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 269, 279–80.[1] Furthermore, the plaintiff bears the burden of proving the falsity of the statements complained of, and will not benefit from any presumption of damages. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 15–16 (1990).

As to private matters, the Supreme Court has been similarly clear that states have "substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual," *Gertz*, 418 U.S. at 345–46, 349. The reason for this latitude is that "speech on matters of purely private concern is of less First Amendment concern." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985). The Supreme Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual," *Gertz,* 418 U.S. at 345–47. Kentucky

---

[1]*N.Y. Times Co. v. Sullivan* held that the actual malice standard applied to published statements regarding public officials, but the holding subsequently has been expanded to cover other individuals, *see Gertz*, 418 U.S. at 334–37, as well as "matters of public interest." *Time, Inc. v. Hill*, 385 U.S. 374, 387–88 (1967).

has chosen to require that private plaintiffs show the alleged defamer's negligence. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886 (Ky. 1981). Additionally, under Kentucky law, such plaintiffs benefit from a presumption that the allegedly defamatory words are false, and in certain circumstances may benefit from a presumption of damages as well. *Stringer*, 151 S.W.3d at 794–96.

Most important for our purposes, the analysis of a defamation claim differs substantially where the claim pertains to a matter of public concern, because the First Amendment shapes the elements of the claim. Whether an issue is a matter of public concern is for the Court to determine as a matter of law. *Banks v. Wolfe County Bd. of Educ.*, 30 F.3d 888, 892 (6th Cir. 2003) (citing *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988)).

A.

Whether a statement relates to a matter of public concern is a complex equation "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

A public concern is one related to the "interchange of ideas for the bringing about of political and social changes desired by the people," but which is not "solely in the individual interest of the speaker and its specific business audience." *Dun & Bradstreet,* 472 U.S. 749, 759, 762 (finding that the dissemination of a false and misleading report by a credit reporting agency to five of its subscribers indicating that a construction company had filed a voluntary petition for bankruptcy did not pertain to a matter of public concern) (internal citations and quotation marks omitted). A statement so qualifies where one "speaks out as a citizen on a matter of general concern, not tied to a personal . . . dispute," *id.* at 148 n.8, and may be "fairly considered as

relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146. The Supreme Court has also noted that "[t]he guarantees for speech and press are not the [exclusive] preserve of political expression or comment upon public affairs, essential as those are to healthy government . . . . [They] must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Hill*, 385 U.S. at 388 (citing *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)) (internal quotations marks omitted). However, while a "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication," even after *Connick*, "the boundaries of the public concern test are not well defined." *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004).

Nevertheless, the Sixth Circuit has characterized *Connick* as "the Supreme Court's most instructive case" on the issue of "whether expression is a matter of public concern." *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (citing *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1050 (6th Cir. 2001)). The Sixth Circuit's "close review" of *Connick* and its own cases has led it to observe that "[s]peech is of 'public concern' if it involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Farhat*, 370 F.3d at 590 (citing *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003); *Wolfe County*, 330 F.3d at 893). Furthermore, the Sixth Circuit has "distilled" the public concern inquiry to one examining the "focus" or "point" of the speech. *Farhat*, 370 F.3d at 592 (listing the ways in which this inquiry has been framed) (internal citations omitted). Thus, "'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of

the speech advances only a private interest." *Id.* at 592–93 (internal citations omitted). At bottom, a court must consider "(1) the point or focus of the speech in question and (2) whether the point 'relat[es] to any matter of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 600 (citing *Connick*, 461 U.S. at 146).

Courts have also referenced so-called "public controversies" in the context of discussing who may be classified as a "public figure" for defamation purposes. These discussions are helpful, though neither Mackin nor Ritchie claim to be public figures.[2] In that context, the Supreme Court has noted that just because a matter "may be of interest to some portion of the reading public" does not make it a "public controversy," and that any interpretation to the contrary would impermissibly "equate 'public controversy' with all controversies of interest to the public." *Time, Inc. v. Firestone,* 424 U.S. 448, 454 (1976) (finding that "[d]issolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public" and even though the divorce was characterized as a "cause celebre" by the Florida Supreme Court).

Some time ago, the D.C. Circuit discussed some of the considerations for determining whether a news story involved a public controversy:

> A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who

---

[2] This Court has discussed at length the public figure doctrine, making it clear by analogy that neither Mackin nor Ritchie would qualify. *Trover, supra.*

> are not direct participants . . . . Newsworthiness alone will not suffice, for the alleged defamation itself indicates that someone in the press believed the matter deserved media coverage. Moreover, a court may not question the legitimacy of the public's concern . . . . Thus, courts must look to what already were disputes . . . . the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

*Waldbaum v. Fairchild Publ'ns, Inc*., 627 F.2d 1287 (D.C. Cir. 1980) (finding that a trade publication's story regarding the ouster of a company's president and CEO did relate to a matter of public concern, since the company "was an innovative company often the subject of news reports"). *See also Dameron v. Wash. Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) ("public interest in a controversy does not make a public controversy. The newsworthiness of an event is not the measuring stick for identifying public controversy. Nor is a voyeuristic interest in someone's private affairs an appropriate substitute"). Doctrinally, a "public controversy" and a "matter of public concern" are probably not coextensive. But the considerations to which courts have looked when determining the existence of the former are undoubtedly relevant when determining the existence of the latter, and the Court finds these discussions of this issue informative.

B.

Against this background, the Court looks at the circumstances alleged here. Defendants insist that the "Troubleshooter" segments are designed as vehicles for consumer protection, and that may well be the case. However, this general proposition, even if true, does not shield these segments from further scrutiny, for it only addresses the question of whether some aspect of the

segments "relat[e] to any matter of political, social, or other concern to the community." *Rodgers*, 344 F.3d at 600 (internal citations and quotation marks omitted). The Court must still examine whether the allegedly public matter was "the point or focus" of the segments. *Id.* That is, the Court looks to whether only "a passing or fleeting reference" was made to the potential matter of public concern. *Farhat*, 370 F.3d at 592.

Certainly the parties are of different opinions on this issue. Defendants argue that the content of the disputed broadcasts was primarily directed toward educating viewers about general problems confronted in the community, and that the individual transaction between Mackin and Jackson was merely used to illustrate these problems. This Court has carefully reviewed "the content, form, and context" of the WAVE-3 broadcasts, "as revealed by the whole record," *Connick*, 461 U.S. at 147–48. Even though the broadcasts may contain a passing reference to generally applicable lessons for the community, the broadcasts essentially amount to a report or exposé about a private transaction between two people. This is the Court's firm judgment based upon the entire record of the broadcasts.

Defendants assert that "there is simply nothing private about the atrocious, substandard living conditions of a local blind woman, or her account of the one-sided sales transaction that got her there," Defendants' Reply at 5, and that the "Troubleshooter" segments garnered significant public attention for Jackson's situation.[3] However, at bottom, these "Troubleshooter"

---

[3]Defendants were made aware of Jackson's situation by a police Lieutenant, but the Court's review of the record indicates that Lt. Hunt's involvement was that of concerned coworker who happened to be a law enforcement officer, nothing more. Similarly, Defendants make much of the fact that following the airing of the initial "Troubleshooter" segment, city councilwoman Tina Ward-Pugh visited Jackson and solicited the community's assistance with Jackson's situation, and that following this request, many volunteers turned out to rebuild the home. The Court views these facts as largely irrelevant to the public concern determination, given that they all occurred *in response to* the initial broadcast.

9

broadcasts focused on a private transaction between two parties. There is no evidence that Mackin serially engages in the selling of substandard homes to handicapped individuals, or that the area has experienced a rash of such sales. The sale of the home simply was not part of an ongoing public debate, dispute, or concern regarding these individuals or their interaction. Furthermore, the focus of the story was not the general lessons one might draw from Jackson's experience, but rather the exposition of her interaction with Mackin.

Defendants argue for a seemingly self-defining proposition that would create an extraordinarily broad protection for publication of defamatory news stories. They assert that because the focus of "Troubleshooter" segments is consumer protection issues, i.e. matters of public concern, then anything broadcast on a "Troubleshooter" segment is *ipso facto* a matter of public concern, including the Jackson-Mackin real estate transaction. To adopt such a standard, however, would allow "those charged with defamation" to "create their own defense" by simply deciding to publish a story about an otherwise private matter, which seems to fly in the face of the Supreme Court's refusal to endorse such a tactic. *See, e.g., Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). Such a standard would make nearly any private issue a matter of public concern provided that there was some conceivable lesson that the public might draw from it. *Cf. Firestone,* 424 U.S. at 454 (finding this approach, in the context of determining whether a public controversy existed, to be foreclosed by Supreme Court precedent).[4]

---

[4] In their briefing and at oral argument, Defendants relied on two cases from the New York state courts in support of their preferred approach to the public concern inquiry, both of which were decided under New York precedent, which is significantly more permissive of defamatory speech than is Kentucky law. *See Chapadeau v. Utica Observer-Dispatch, Inc.*, 341 N.E.2d 569 (N.Y. 1975). New York courts defer substantially to "the judgment of journalists and editors," which the courts "will not second-guess absent clear abuse." *Weiner v. Doubleday & Co.*, 549 N.E.2d 453 (N.Y. 1989). This deference to "professional journalistic judgments," *Huggins v. Moore*, 726 N.E.2d 456 (N.Y. 1999), is a doctrinal gloss the New York courts have placed on *Connick*, and it is readily apparent that this gloss was a significant if not dispositive factor in the cases to which Defendants look for support.

Aside from the fact that this gloss seems not easily reconciled with the New York courts' acknowledgment

To adopt the standard Defendants propose would obliterate any meaningful distinction between private and public matters, would contravene *Hutchinson* and *Firestone* by giving the media virtually sole discretion to determine what is and is not a public concern. More important, such a conclusion requires one to ignore the Supreme Court, Sixth Circuit, and Kentucky jurisprudence acknowledging the existence of a sphere of content that cannot be turned into a public concern simply because a journalist thinks it may be interesting to a viewer or a reader. The Court declines Defendants' invitation to adopt such a broad standard.

For all these reasons, the Court finds that as a matter of law WAVE-3's reporting on Jackson's purchase of her home was not a matter of public concern. Thus, Defendants' arguments regarding Plaintiffs' alleged inability to prove falsity and actual malice are moot, since Plaintiffs will be required merely to prove negligence and the burden will be on

---

that "the fact that the article has been published in a newspaper is not conclusive that its subject matter warrants public exposition," *id.*, the Court finds no support for it in Sixth Circuit or Kentucky cases, either of which might have articulated the view that the First Amendment commanded such deference had they found it appropriate to do so. Quite simply, New York courts evince a greater solicitude for the scope of the First Amendment than is mandated by the Supreme Court or which finds support in Kentucky or Sixth Circuit jurisprudence.

Furthermore, the facts of *Cottom v. Meredith Corp.*, to which Defendants devote significant attention, distinguish it from the instant case. While *Cottom* involved an investigative report of an elderly couple living in a substandard home, the court explicitly noted that the matters discussed in the report addressed "a substantial segment of the population, and have been the subject of extensive governmental attention," leading the court to conclude that "the health and safety of elderly people are within the sphere of legitimate public concern." 411 N.Y.S.2d 53 (N.Y. App. Div. 1978). In an important distinction from the instant case, the court also noted that the subject of the story at issue was "symptomatic of the larger problem," and that the broadcast only "incidentally referred to a private legal dispute," while "the story as a whole was a matter of legitimate public concern." *Id.* Indeed, the story was entitled "People are Freezing in Summerhill," evidence of the story's focus on a community-wide problem rather than a single transaction. *Id.*; *see also Huggins*, 726 N.E.2d 456 (emphasizing the dispositive nature of these facts).

Here, the "Troubleshooter" segments at issue were at all times styled as reports on an isolated incident. The "teasers," as well as the segments themselves, referred to the specific transaction between Jackson and Mackin, never purporting to be reporting on a broader problem or concern. In short, the differences in the subject and nature of the story before the court in *Cottom* and that considered here further diminish the usefulness of *Cottom* to this Court.

11

Defendants to prove the truth of the broadcasts.[5]

### III.

Defendants make two other arguments in support of their motion that, though directed toward the issue of Plaintiffs' ability to prove falsity under the public concern analysis, also speak to the issue of whether the complained-of statements could be found defamatory under any standard.

Plaintiffs first argue that several of the disputed statements are true, or at least substantially true. Truth is a complete defense to a defamation action in Kentucky. *See, e.g., Stringer*, 151 S.W.3d at 796. But while it is the case that "[w]here the defendant is a newspaper, the rule is that it is not to be held to the exact facts or to the most minute details of the transactions that it reports," and that "[w]hat the law requires is that the publication be substantially true," *Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84 (Ky. 1966), Kentucky courts have made clear that "[t]he doctrine of 'substantially true' is a convenient and necessary phrase invented by lawyers and judges to apply in very narrow and limited circumstances and relates only to incidental information and not to essential content . . . . [t]ruth as contrasted to falsehood is the basis for a defamation claim." *Kentucky Kingdom Amusement Co. v. Belo Ky., Inc. d/b/a WHAS-TV*, 179 S.W.3d 785 (Ky. 2005). Here it appears that Defendants base their allegations on statements they assert are almost entirely false, making it unlikely that the difference between "true" and "substantially true" will play a role in the case.

Plaintiffs also argue that several of the disputed statements are simply hyperbole or

---

[5]Defendants' argument regarding the impact of Ky. Rev. Stat. § 411.061(1) is similarly moot, given that Plaintiffs' then-counsel sent a letter to WAVE-3 in accordance with that provision dated May 27, 2004, in which he objected to the content of the "Troubleshooter" segments.

12

opinion, and inasmuch as such types of statements do not allege facts, they cannot be actionable as defamatory. As a statement of doctrine, this is surely correct, since "only provable false assertions of fact can provide the basis for a defamation action." *Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 730 (Ky. 1999) (citing *Milkovich*, 497 U.S. at 18–19). However, in drawing the line between fact and opinion, Kentucky courts have noted that:

> [a] defamatory communication may consist of a statement in the form of an opinion . . . if it implies the allegation of undisclosed defamatory fact as the basis for the opinion . . . . [I]f the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

*Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989) (quoting and adopting Restatement (Second) of Torts § 566 (1977)).

At least several of the statements about which Plaintiffs have complained cannot, it appears, be explained away as merely "substantially true," or characterized simply as hyperbole or opinion. For example, WAVE-3's airing of Jackson's assertion that Mackin's "Southern Indiana friend" arranged the financing of the home is contradicted by the fact that Jackson apparently received financing through Fifth Third Bank of Louisville. Other examples of statements the truth of which is in doubt include the airing of allegations regarding Mackin's and Ritchie's desire to sell the home to a blind person and the segments' descriptions of the appraisals, or lack thereof, done on the home. Even the allegation that Jackson was "scammed" is not so clearly hyperbole or opinion as Defendants would have it, as in the instant situation the presence or absence of a "scam" may well be demonstrated by Plaintiffs, and the connotations of the word "scam" in this context may well be found to imply knowledge of undisclosed defamatory facts. Therefore the Court cannot properly grant summary judgment to Defendants

13

on the grounds that the segments as a whole were merely hyperbole or opinion, or were substantially true.

IV.

Finally, Defendants argue that Plaintiffs' failure to demonstrate any damages from the allegedly defamatory "Troubleshooter" segments must be fatal to their defamation claim, since plaintiffs must plead and prove their damages when defamatory statements pertain to matters of public concern. *See, e.g.*, Defendants' Reply at 2–3. While this argument fails given the Court's determination that the "Troubleshooter" broadcasts did not address a matter of public concern, the issue of Plaintiffs' responsibility for pleading and proving damages merits further comment, especially in light of Plaintiffs' argument that the broadcasts were defamatory *per se*.

Under Kentucky law, defamatory statements may be actionable *per se* or actionable *per quod*, and "in the former class, damages are presumed and the person defamed may recover without allegation or proof of special damages," whereas "[i]n the latter class, recovery may be sustained only upon an allegation and proof of special damages." *Stringer*, 151 S.W.3d at 794. The Court determines as a matter of law whether the disputed statements are actionable *per se.* *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981).

As this Court has noted in the past, "[t]he doctrine of defamation *per se* grew out of a need to provide individuals a remedy for statements which damaged their reputations by the very nature of the words where the individuals could not prove actual damages." *CMI, Inc. v. Intoximeters, Inc.*, 918 F.Supp. 1068, 1084 (W.D. Ky. 1995). Kentucky courts have found actionable *per se* words that "either directly or indirectly import 'fraud, dishonesty, or sharp or unethical practices on the part of the [plaintiff].'" *Id.* at 1083 (citing *White v. Hanks*, 255 S.W.2d

14

602, 603 (Ky. 1953)). Similarly, words are actionable *per se* if "taken in their natural meaning and in the sense in which they would be understood by those to whom addressed . . . [they] tend to disgrace or degrade [the plaintiff], or to hold him up to public hatred, contempt, or ridicule, or to cause him to be shunned or avoided, or to directly prejudice or injure him in his business by imputing to him a want of fitness for engaging therein." *Gahafer v. Ford Motor Co.*, 328 F.3d 859 (6th Cir. 2003) (quoting *Towles v. Travelers Ins. Co.*, 137 S.W.2d 1110, 1111 (Ky. 1940)); *see also Disabled Am. Veterans, Dep't of Ky., Inc. v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005).

Here, the broadcasts' allegations that Jackson was taken advantage of by Plaintiffs unquestionably "import fraud, dishonesty, or sharp or unethical practices," *CMI,* 918 F.Supp. at 1084, and stand in contrast to words that are merely actionable *per quod*, which "are not actionable on their face," *Crabb*, 182 S.W.3d at 547, thereby requiring courts to examine "the extrinsic facts which explain the meaning of the communications," *CMI,* 918 F.Supp. at 1083. The broadcasts left no doubt about the nature of their allegations against Plaintiffs, which, as Defendants acknowledge, included assertions "that Mackin and Ritchie took advantage of [Jackson's] disability and sold her a home . . . that was in atrocious condition." Defendant's Memorandum at 9. Such statements are well within the confines of the actionable *per se* category. Therefore Plaintiffs benefit from a presumption of damages, and their failure to plead or prove damages is not fatal to their defamation claim.[6]

---

[6]Interestingly, Defendants seem to want to have their proverbial cake yet eat it too on the damages issue. This action was removed to federal court by Defendants, who in their removal notice state that "[i]t is certainly more likely than not that the damages sought exceed the $75,000 threshold." Notice of Removal at ¶ 9. However, Defendants assert in their motion for summary judgment that Plaintiffs have no damages at all. *See generally* Defendants' Motion for Summary Judgment at 29–30, 37–40.

As noted above, the Court's finding that Plaintiffs benefit from a presumption of damages allows Plaintiffs'

15

V.

Defendants' arguments regarding Plaintiffs' inability to prove actual malice also call into question the viability of Plaintiffs' false light invasion of privacy claim. In order to reach the jury on this claim, Plaintiffs must prove that (1) the false light in which they were placed would be highly offensive to a reasonable person, and (2) Defendants had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs were placed. *McCall*, 623 S.W.2d at 888. This second element amounts to the "actual malice" standard discussed above, and "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)) (internal quotation marks omitted); *see also Yancey,* 786 S.W.2d at 860 (noting Kentucky courts' adoption of the Supreme Court's actual malice standard in false light invasion of privacy cases).

In their motion, Defendants argue that Plaintiffs have provided no evidence of actual malice. However, in reviewing the record the Court cannot find that no material issue of fact exists as to whether there were "obvious reasons to doubt the veracity" of the allegations made in the "Troubleshooter" segments. It is undisputed that the segments were aired without any substantial input from Mackin or Ritchie, and despite Jackson's blindness and the deplorable condition of her home, the record before the Court does not foreclose upon the possibility that

---

action to proceed regardless of their ability to plead or prove damages. If anything, Defendants' argument as to the absence of damages would counsel not for summary judgment, but for remand to state court. However, the Court will retain jurisdiction at this time despite the parties' near-concession at conference that any compensatory damages recovered by Plaintiffs would be nominal, since Plaintiffs' potential recovery of punitive damages obviates any concerns about the propriety of federal jurisdiction.

16

there may have been "obvious reasons" to doubt her allegations that she was "scammed" and taken advantage of when she purchased the home two years earlier. Therefore, while "an injured party may seek relief through both [defamation and false light] causes of action, arising out of the same publication, but he is limited to only one recovery," *McCall*, 623 S.W.2d at 888–89, the Court finds that summary judgment would be inappropriate as to Plaintiffs' false light invasion of privacy claim at this time.

## VI.

Since as a matter of law the "Troubleshooter" segments giving rise to Plaintiffs' action were not reporting matters of public concern, the structure of subsequent proceedings should now be more clear. As discussed above, in order to make out their defamation claim Plaintiffs need only prove negligence, and they will benefit from a presumption of damages. The truth of the broadcasts, if established by Defendants, will be a complete defense to the defamation claim. In order to establish their false light invasion of privacy claim, Plaintiffs will need to prove (among other things) actual malice on Defendants' part, and as in *McCall*, though Plaintiffs may proceed under both causes of action, they may only have one recovery for this incident.

In light of the clarification the Court's ruling provides, the Court is of the belief that an opportunity for further dispositive motions is in order, given that the bulk of Defendants' briefing proceeded from the idea that the "Troubleshooter" reports addressed matters of public concern. And while the Court is mindful that "the defamatory material should be construed as a whole," *McCall*, 623 S.W.2d at 884, all parties would benefit from a concise statement by Plaintiffs identifying exactly what statements they are alleging are defamatory and/or invaded their privacy by publicly portraying them in a false light. The record, the parties' briefs, and

17

Plaintiffs' counsel's statements at conference have indicated several disputed statements, *see, e.g.*, Plaintiffs' Response at 2; Plaintiffs' Response, Exhibit 10, but as yet there does not yet appear to be a truly exhaustive list in the record. Such a comprehensive list would enable Defendants, who under the state law defamation framework bear the burden of proving truth as a defense, to respond systematically to each statement should they choose to do so, and the terms of the dispute would be better defined prior to trial.

Therefore the Court will order Plaintiffs to file such a list, and will allow the parties a period within which they may file further dispositive motions in light of the list and the analytical framework clarified by the Court in this opinion.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that on or before **June 4, 2008**, Plaintiffs shall file a list identifying the precise statements forming the basis of their defamation and false light invasion of privacy claims, accompanied by a brief description of why each identified statement is defamatory and/or supports their false light claim.

This is NOT a final order.

cc:   Counsel of Record